UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ALICIA E. MAGGIO
  Plaintiff

  V.

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF
AMERICA, LOCAL NO. 379, NEW
ENGLAND TEAMSTERS AND TRUCKING
PENSION FUND, AND CONSTRUCTION
TEAMSTERS HEALTH AND WELFARE
FUND
  Defendants

05  10721 RCL

CIVIL ACTION NO.

RECEIPT # _____ 63455
AMOUNT $ _____ 250.00
SUMMONS ISSUED _____ 5
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____ M.T.
DATE _____ 4/13/05

MAGISTRATE JUDGE _____ JLA

## COMPLAINT

## PARTIES

1.     Plaintiff Alicia E. Maggio ("Ms. Maggio") is a resident of Henniker, New

Hampshire.

2.     Defendant International Brotherhood of Teamsters, Chauffeurs, Warehousemen,

and Helpers of America, Local No. 379 ("Local 379") is a labor organization within the meaning

of the Labor Management Relations Act ("Act"), 29 U.S.C. §152 *et seq.*  Local 379 has a

principal place of business at 22 Farragut Road, South Boston, Suffolk County, Massachusetts.

3.     Defendant New England Teamsters and Trucking Industry Pension Fund

("Pension Fund") is a multiemployer pension fund and the Teamster entity in New England to

which monies withheld from members of Local 379 are paid to provide pension benefits to its

members.  The Pension Fund has a principal place of business at 535 Boylston Street, Boston,

Suffolk County, Massachusetts.

1

4.    Defendant Construction Teamsters Health and Welfare Fund ("Health and Welfare Fund") is the multiemployer welfare fund and the Teamster entity in New England to which monies withheld from members of Local 379 are paid to provide health and welfare benefits to its members.  The Health and Welfare Fund has a principal place of business at 529 Main Street, Suite 205, Charlestown, Suffolk County, Massachusetts.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1367 and 2201 *et seq.* and 29 U.S.C. §§ 185 and 187, as this case arises under the Act. Venue is proper in this Court under 28 U.S.C. §1391 and Local Rule 41.1.

## FACTUAL ALLEGATIONS

6.    Until her retirement in 2003, Ms. Maggio was the owner/operator of a heavy-duty dump truck designed for the hauling of dirt, gravel, rocks and other composite materials.  Doing business as Maggio & Son Trucking Co., Ms. Maggio provided trucking services to various general contractors and subcontractors for the hauling of construction materials, primarily dirt, gravel, rocks, and other composite materials.  She was the working owner of her business, which had no non-owner employees.

7.    Between September 1998 and April 2002, Ms. Maggio provided trucking services to general contractors and subcontractors working on the Central Artery/Tunnel CA/T Project, commonly called "The Big Dig" ("CA/T Project").

8.    The CA/T Project included building a tunnel under the Boston Harbor to Logan Airport as an extension of I-90 (The Ted Williams Tunnel), and placing underground a portion of I-93 known as the Central Artery, which runs through downtown Boston, underground.

2

9.     Prior to commencing the CA/T Project, Bechtel/Parsons Brinkerhoff ("B/PB"), on behalf of the Massachusetts Department of Public Works, the Building and Construction Trades Council of the Metropolitan District and its affiliated local unions, and the Building and Construction Trades Department, AFL-CIO, and its affiliated international unions and their affiliated local unions, entered into a CA/T Project Labor Agreement (the "PLA") purportedly to govern labor relations on the CA/T Project.

10.    A uniform statewide practice has existed for years under which fringe benefit contributions have not been required for certain truck drivers designated as "owner/operators." Owner/operators are individuals who own their own trucks and subcontract their trucking services from time to time to various contractors and subcontractors on various construction CA/T Projects. Over the years, the Teamsters, including Local 379, have made unsuccessful efforts to alter this non-contribution practice.

11.    Ms. Maggio was an owner/operator.

12.    On information and belief, various general contractors contracted with the Massachusetts Highway Department ("MHD") for the construction of the CA/T Project for the removal of dirt, gravel, rocks, and other composite materials on the CA/T Project. B/PB is the manager of the total CA/T Project and was hired by MHD.

13.    Ms. Maggio hauled dirt and other composite materials to various dumpsites inside the Commonwealth of Massachusetts. Ms. Maggio subcontracted her labor and truck to various general contractors and/or subcontractors on the CA/T Project. She was paid $65.00 an hour for such services. To receive payment, Ms. Maggio was required to submit, and did submit, time sheets and state and federal compliance forms.

14.    Ms. Maggio assumed the entrepreneurial risks and expenses of operating her business. She was responsible for the cost of licensing, titling, permitting, maintaining,

3

repairing, and insuring her truck, complying with all state and local government regulations regarding its operation, and for paying appropriate use, excise and income taxes. She received no payment for these expenses from the various general contractors or the subcontractors for whom she worked on the CA/T Project beyond hourly wages.

15.    Ms. Maggio controlled the details of the performance of her work. She was free to choose who operated her truck on any given day and was free to determine on which particular days the truck would operate. There were days on which she chose not to work on the CA/T Project but to work instead for small non-union contractors.

16.    Within any given work day, Ms. Maggio was free to determine her methods of operation, including such decisions as whether to accept or refuse a load. On several occasions, Ms. Maggio rejected loads because the contractor had overloaded her truck, or the load was too wet and was leaking out, or because the load was falling over the sides of the truck body.

17.    In addition, Ms. Maggio was free to determine her work schedule, including when to take vacations, and she enjoyed the right to work for other contractors, either concurrently or following completion of her work on the CA/T Project. With respect to these activities, Ms. Maggio was not subject to the supervision, direction, or control of the various general contractors or subcontractors for whom she worked on the CA/T Project. None of the various general contractors or subcontractors for whom she worked on the CA/T Project reserved the right, either expressly or implicitly, to control the manner, time, means and details of, and by which, Ms. Maggio performed her work.

18.    Ms. Maggio enjoyed the right to quit the CA/T Project whenever she wanted and reapply to work at any time depending upon the availability of work. Likewise, the various general contractors and subcontractors were free to decide to re-hire an owner/operator, including Ms. Maggio, on a day-to-day basis as the work level required. General contractors and

4

subcontractors determined the number of trucks they needed on the job each day by the amount of dirt being excavated on that particular day.

19.    Ms. Maggio was not required to display any contractor's logo or name on her truck or to paint her truck so as to identify it with any particular contractor. Nor was she required by any contractor to wear a company uniform.

20.    Ms. Maggio did not fill out a W-4 for any general contractor or subcontractor for whom she worked on the CA/T Project. General contractors or subcontractors did not deduct federal or state taxes, Social Security or Medicare payments from her wages. They did not carry her on their payroll as an employee, and did not supply her with W-2 forms. She was always treated as a self-employed person, responsible for applicable federal and state taxes, Social Security/self-employment taxes and Medicare payments..

21.    The CA/T Project is a prevailing wage job under the laws of the Commonwealth of Massachusetts. M.G.L.A. c.149, §26, et. seq. The law required that Ms. Maggio be paid an hourly wage sufficient to pay her the prevailing wage net of her overhead expenses. The CA/T Project was covered by a Project Labor Agreement ("PLA"). The tradition in New England concerning owner/operators covered by a PLA, particularly in Massachusetts and Rhode Island, is that they become members of the applicable union local, paying the appropriate dues for the duration of service on the particular project, but do not have deductions taken from their pay for union health and welfare and pension benefits. This tradition has been in effect for more than 25 years.

22.    On or about the end of April or beginning of May 1997, inspectors from the Attorney General's Office of the Commonwealth began to appear on the job site of the CA/T Project to investigate whether the prevailing wage was being paid. On information and belief, the Attorney General's Office determined that owner/operators working on the CA/T Project

5

were not being paid an amount of money sufficient to cover their overhead and pay themselves the prevailing wage in Massachusetts.

23.    This investigation led to a job action by the owner/operators at the Subaru Pier in South Boston, Massachusetts and in Boston on May 27-28, 1997 to protest the failure of the CA/T Project's prime contractors to pay the owner/operators an amount of money sufficient enough to cover their overhead and pay themselves the prevailing wage.

24.    In June 1997, as a result of this job action and the Attorney General's investigation, the MHD established an ad hoc group, purportedly to resolve the prevailing wage issue. The work of this group led to the CA/T Project Memorandum of Agreement on Trucking Issues ("MOA") between Local 379, MHD, the Massachusetts Department of Labor and Work Force Development, B/PB, certain prime contractors and certain members of the trucking industry (See Exhibit A). The MOA, among other things, provided that the owner/operators of triaxle trucks were to be paid $65.00 an hour under contracts awarded before July 1, 1997, for trips less than 25 road miles. The MOA also provided that health and welfare and pension benefits were to be deducted from the pay of the owner/operators and were to be paid to Local 379.

25.    In accordance with the MOA, the amounts to be deducted were as follows:

    a.  January 1, 1998 through November 30, 1998: $7.96 per hour ($4.50 health and welfare, $3.46 pension).

    b.  December 1, 1998 to November 30, 1999: $8.36 ($4.90 health and welfare, $3.46 pension);

    c.  December 1, 1999 to November 30, 2000: $8.81 ($4.90 health and welfare, $3.91 pension);

      d.  December 1, 2000 to November 30, 2001: $9.06 ($5.00 health and welfare, $4.06 pension); and

      e.  December 1, 2001 to November 30, 2003: $9.46 ($5.25 health and welfare, $4.21 pension).

26.     The owner/operators refused to sign the MOA. Following the drafting of the MOA, Local 379, MHD and B/PB entered into a Memorandum of Understanding as to Teamster Benefits ("MOU"). See Exhibit B. The purpose of the MOU was to resolve certain issues under paragraphs 8A and 8B of the MOA concerning contributions by contractors to pay health and welfare and pension benefits on behalf of the owner/operators. Under the terms of the MOU, all contractors were required to make health and welfare and pension benefit payments to Local 379 on behalf of any owner/operators performing work for them on the CA/T Project, including Ms. Maggio, with the exception that payments were not required for owner/operators who were deemed employers by virtue of (a) employing one or more drivers working at least 160 hours on the CA/T Project during the 6-month period before certification, or (b) employing one or more drivers working at least 600 hours at construction sites other than the CA/T Project during the 12-month period before certification, and these owner/operators properly enrolled under the MOU. Paragraph 7 of the MOU provided that "should a determination be made, at any time, by the Funds that an owner-operator or driver for whom contributions were received by the Funds is not eligible for benefits relating to those contributions, any contributions received by the Funds during the period such owner-operator or driver was determined to be ineligible for benefits shall be promptly returned by the Funds to the owner-operator or driver." Owner/operators, including Ms. Maggio, were not parties to the MOU.

27.     As an owner/operator, Ms. Maggio had money deducted from her pay despite the fact that she was not a party to and did not sign the MOA.

28. Various general contractors and subcontractors deducted health and welfare, and pension benefits from Ms. Maggio's pay on the CA/T Project, which were supposed to be paid to Local 379 on her behalf.

29. Some but not all of these payments were made to the Teamsters' Health and Welfare Fund and Pension Fund on Ms. Maggio's behalf. Ms. Maggio filed three union grievances against Modern Continental for non-payment of pension benefits to the Funds, which resulted in payment by Modern Continental of some, but not all, of the money that the company was supposed to contribute to the Funds.

30. On information and belief, various general contractors and subcontractors previously were holding the money for health and welfare, and pension benefits in trust pending resolution of the controversy over whether it was legal to pay this money to Local 379 on behalf of the owner/operators in light of the Court's ruling in Labor Relations Division of Construction Industries of Massachusetts v. Teamsters Local #379, Civil Action No. 95-11311-RCL.

31. Most owner/operators, including Ms. Maggio, maintained their own health and welfare and pension programs as self-employed persons. Ms. Maggio maintained health insurance purchased through the National Association For The Self-Employed (NASE) until July 1999, when she joined Local 379 and was forced to make contributions to the Health and Welfare Fund. Under the health and welfare plan owner/operators, including Ms. Maggio, received from Local 379, there was no portability; that is, other Teamster locals would not allow owner/operators to transfer their plan and would not make the health care deductions because they believed this would be in violation of the Act. As a result, owner/operators, including Ms. Maggio, lost their healthcare benefits from Local 379 after their work on the CA/T Project ended. On four separate occasions between July 1999 and April 2002, Ms. Maggio's health and welfare benefits were cancelled because Modern Continental failed to contribute some of the

8

money that it was required to pay the Health and Welfare Fund, causing her hours to fall below the threshold number per month required for eligibility.

32.    With respect to pensions, most, if not all, of the owner/operators, including Ms. Maggio, never accrued enough hours working on the CA/T Project for the pension benefits paid into the Pension Fund to vest. As a result, Ms. Maggio received absolutely no benefit whatsoever from the monies deducted from her pay and was deprived of the ability of investing those funds as she saw fit in her own retirement program as envisioned by Massachusetts' prevailing wage law. The withholding of such money imposed and continues to impose an extreme financial hardship on Ms. Maggio in her retirement.

33.    On October 1, 1999, defendant Health and Welfare Fund notified certain owner/operators who were plaintiffs in <u>Andriole v. Teamsters, Local 379</u>, C.A. 00-12640-RCL, that if they claimed independent contractor status, monies would continue to be deducted from their pay by the contactors for whom they worked, but they would no longer be eligible to receive health and welfare benefits from the Health and Welfare Fund (<u>see</u> **Exhibit C**). In a second letter to the <u>Andriole</u> plaintiffs dated October 22, 1999 (**Exhibit D**), defendant Health & Welfare Fund reiterated its position that "[n]o benefits will be provided for independent contractors even though contributions will be required ... for those hours they work on [the CA/T Project]." After that date, various general contractors and subcontractors, in collusion with Defendant Teamsters, Local 379, and defendants the Health and Welfare Fund and Pension Fund, nevertheless continued to withhold monies from the owner/operators, including Ms. Maggio, and continued to pay it to the respective funds.

34.    According to records maintained by the Health and Welfare Fund and the Pension Fund, approximately $41,107.70 ($24,494.95 health and welfare, $16,612.75 pension) has been deducted from Ms. Maggio's pay and paid into the two Funds.

## COUNT I

### (Violation of Section 302 of the
### Labor Management Act)

35.    Ms. Maggio incorporates and realleges, as if fully set forth in this Paragraph, the allegations of paragraphs 1 to 34 above.

36.    By withholding the money for health and welfare and pension payments from Ms. Maggio's pay, the Defendants have violated Section 302 of the Act, 29 U.S.C. §186.

## COUNT II

### (Common law conversion)

37.    Ms. Maggio incorporates and realleges, as if fully set forth in this Paragraph, the allegations of paragraphs 1 to 36 above.

38.    Defendants transferred or diverted Ms. Maggio's funds to the Health and Welfare Fund and the Pension Fund in violation of her rights, title, and interest in such funds.

39.    Defendants have exercised and continue to exercise dominion and control over property belonging to Ms. Maggio and have unlawfully converted such property to their own use and benefit in violation of Massachusetts common law.

## COUNT III

### (Violation of Labor Management Relations Act and Prevailing Wage Law)

40.    Ms. Maggio incorporates and realleges, as if fully set forth in this Paragraph, the allegations of paragraphs 1 to 39 above.

41.    Upon information and belief, Defendants agreed to transfer, divert, and/or convert Plaintiffs' funds to the Pension Fund and the Health and Welfare Fund.

42.    Such transfer, diversion and/or conversion violated the Massachusetts prevailing wage law. M.G.L.A. 149 § 26, et. seq.

COUNT IV

(Breach of Fiduciary Duty)

43.    Ms. Maggio incorporates and realleges, as if fully set forth in this Paragraph, the allegations of paragraphs 1 to 42 above.

44.    The Pension Fund and the Health and Welfare Fund owed Ms. Maggio a duty as fiduciaries.

45.    The Pension Fund and the Health and Welfare Fund have breached their duty to Ms. Maggio by transferring, diverting, converting and maintaining funds that belong to Ms. Maggio.

46.    As a direct and foreseeable result of the breach of such duty, Ms. Maggio has been damaged in the amounts diverted to the respective funds.

COUNT V
(Equitable Restitution Under ERISA)

47.    Ms. Maggio incorporates and realleges, as if fully set forth in this Paragraph, the allegations of paragraphs 1 to 46 above.

48.    The Health and Welfare Fund is an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1002(3).

49.    The Pension Fund is an employee pension benefit plan within the meaning of ERISA.

50.    At all times relevant to this action, Ms. Maggio was an employer within the meaning of ERISA, 29 U.S.C. §1002(5).

51.    As a working owner with no non-owner employees, Ms. Maggio was not qualified to participate in either the Health and Welfare or Pension Funds, and none of the

11

money contributed on her behalf to the Plans was ever part of an ERISA plan. She was ineligible to participate in either the Health and Welfare or Pension Funds.

52.    Paragraph 7 of the MOU provides for restitution to employers of amounts improperly paid to and unjustly retained by the Funds on their behalf.

53.    Ms. Maggio is entitled to recovery of contributions made on her behalf into the Pension Fund and Health and Welfare Funds under a federal common law theory of restitution.

## COUNT V

## (Declaratory Relief Under 28 U.S.C. §2201)

54.    Ms. Maggio incorporates and realleges, as if fully set forth in this Paragraph, the allegations of paragraphs 1 to 53 above.

55.    Ms. Maggio maintains that the deductions from her pay for health and welfare and pension benefits violated federal and state labor laws, and that the continued exercise by the Defendants of dominion and control over such amounts constitute conversion under Massachusetts common law. Ms. Maggio also contends that, based on documentation she has provided to the Funds establishing that she is an independent contractor for whom contributions should not have been received by the Funds, the Funds were obligated by law to determine that she was not eligible for benefits relating to those contributions, and hence that contributions received by the Funds during the period must, under Paragraph 7 of the MOU, be promptly returned by the Funds to Ms. Maggio. Ms. Maggio further contends that, to the extent the CA/T PLA, MOA, and MOU required benefit payments to be made to the Fund on her behalf, such agreements are unenforceable as a matter of law.

22.    The Defendants deny that they have violated federal and state labor laws, deny that provisions of the CA/T PLA, MOA and/or MOU are unenforceable, or that their refusal to turn over the funds deducted from Ms. Maggio's pay for work on the CA/T Project constitutes

12

common law conversion or violates their contractual obligation to Ms. Maggio under Paragraph 7 of the MOU.

23.    An actual case or controversy thus exists with respect to the respective rights of Ms. Maggio and the Defendants to the funds deducted from Ms. Maggio's pay and contributed on her behalf to the Funds.

## PRAYERS FOR RELIEF

WHEREFORE, plaintiff Alicia E. Maggio requests that this Court:

(i)     Enter judgment declaring that Defendants have violated Section 302 of the Labor Management Relations Act by receiving contributions on Ms. Maggio's behalf between 1998 and 2002;

(ii)    Enter judgment declaring that the Defendants have violated the Massachusetts Prevailing Wage Law by causing deductions to be made from Ms. Maggio's pay for health and welfare, and pension payments;

(iii)   Enter judgment declaring that the Defendants have violated Massachusetts common law by converting the money deducted from Ms. Maggio's pay to their own use;

(iv)    Enter judgment declaring that provisions of the CA/T PLA, MOA, and MOU requiring illegal benefit payments to be made to the Funds for the benefit of Ms. Maggio are unenforceable, *ultra vires*, and of no force or effect;

(v)     Enter judgment declaring that Ms. Maggio was not qualified to participate in an ERISA protected plan such that none of the money she contributed to the Funds was ever part of an ERISA plan;

(vi)    Enter judgment declaring that Ms. Maggio was not qualified to be a beneficiary of ERISA-sheltered employee benefit plans.

(vii)   Enter judgment ordering equitable restitution by the Funds, pursuant to Paragraph 7 of the MOU, of all monies deducted from Ms. Maggio's wages and paid into the Funds;

(viii)  Order Defendants to account to Ms. Maggio for all funds transferred, diverted, or converted to the Pension Fund and the

Health and Welfare Fund in her name and to repay to Ms. Maggio any and all monies withheld from her pay with interest;

(ix)     Award Ms. Maggio as damages the monies that were transferred, diverted or converted to the Pension Fund and the Health and Welfare Fund with interest;

(x)     Order the Pension Fund and the Health and Welfare Fund, due to their breach of fiduciary duty, to repay to Ms. Maggio her share of the monies that were transferred, diverted or converted to the Pension Fund and the Health and Welfare Fund with interest;

(xi)     Require Defendants to pay Ms. Maggio both the costs of this action and her reasonable attorney's fees; and

(xii)     Grant such other different and/or further relief as this Court deems appropriate.

PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES
THAT ARE TRIABLE BY JURY AS A MATTER OF RIGHT

ALICIA E. MAGGIO
By her attorney,

Lindsey Marie Straus, Esquire
BBO #554181
Law Office of Lindsey M. Straus
1583 Main Street
Brewster, MA 02631
(508) 896-8008

Dated: April 12, 2005

14

# CENTRAL ARTERY/TUNNEL PROJECT
## MEMORANDUM OF AGREEMENT
## ON TRUCKING ISSUES

## BACKGROUND

1.  A Trucking Issues Committee (Committee) was formed to address relevant issues regarding the application of Massachusetts Prevailing Minimum Wage Law and other wage and benefit related issues for truckers and trucking companies who provide support for Central Artery/Tunnel (CA/T) Project Work.

2.  The members of the Committee consist of representatives of the trucking industry (trucking subcontractors, brokers, fleet owners, owner/operators), CA/T general contractors (Contractors), the Massachusetts Highway Department (MHD), Bechtel/Parsons Brinckerhoff (B/PB), the Teamsters Local No. 379 (Teamsters), the Massachusetts Department of Labor and Workforce Development (DOL), and the Construction Industries of Massachusetts (CIM).

3.  The mission of the Committee was to discuss concerns and issues pertaining to prevailing wage law compliance and to reach a settlement which would allow for compliance with the Prevailing Minimum Wage Law while providing for labor harmony and continued performance of trucking work.

4.  The Committee met several times and at a meeting held on June 16, 1997, the MHD representatives presented a proposal which, as modified in light of information supplied by the parties, has resulted in the terms of this Memorandum of Agreement (Agreement).

## THE PARTIES TO THIS MEMORANDUM OF AGREEMENT AGREE AS FOLLOWS:

1.  **This Agreement shall not take precedence over or change provisions of the Project Labor Agreement or the Prevailing Minimum Wage Law. This Agreement is a settlement of disputed issues on the CA/T Project and applies only to the CA/T Project. This Agreement is not designed or intended to set any precedent for any other project in which any party to this Agreement is a participant, and cannot be used as evidence in any other matter.**

2.  By accepting this Agreement, the Parties are not admitting to any wrongdoing or any violation of contract, law or public policy and reserve the right to take any position inconsistent with the settlement in any pending or future litigation, except to the extent provided for in this Agreement.

3.  The trucking hourly rate adjustments contained in this Agreement are made for the purpose of settling all related issues for remaining work currently in existing CA/T Project contracts awarded before July 1, 1997 (Existing Contracts). Trucking rates for future CA/T Project contracts awarded on July 1, 1997 or thereafter (Future Contracts) will be determined by the marketplace.

1

4.    The Parties understand and ⟨ ⟩ that the CA/T Project is subject to ⟨ ⟩ Massachusetts Prevailing Minimum Wage Law, G.L. c.149 sec. 26 et seq., and the Project Labor Agreement, and that such Law and the Project Labor Agreement will be taken into consideration in all price proposals by the parties.

5.    This Agreement will take effect as of **July 1, 1997** for Existing Contracts as defined in Item 3, above, and shall remain in effect through the end of each such existing construction contract. By accepting the terms of this Agreement, the Parties waive any past claims for unpaid wages, benefits, or benefit fund contributions, to the extent permitted by law.

6.    TRUCKING RATE ADJUSTMENT:  MHD and the Contractors agree to fund a settlement of the trucking rate issue by adjusting the hourly rate to be paid for operating and maintaining trucks on remaining work in Existing Contracts as provided below. The term "long haul" for purposes of this section shall mean trips in excess of 25 road miles, one way, by most direct route.

      10 Wheelers:    $60/HR (short haul); $65/HR (long haul)
      Triaxles:       $65/HR (short haul); $70/HR (long haul)
      Trailers:       $75/HR (short haul); $80/HR (long haul)

The Parties understand and agree that the above rates include compensation for minimum prevailing wages, those benefits required by the Prevailing Minimum Wage Law (provided through the Construction Teamsters Health & Welfare Fund and the New England Teamsters & Trucking Industry Fund), and all other operating costs, including insurance costs. It is further understood and agreed that the above settlement rates remain constant regardless of overtime conditions, recognizing that the reduction in distribution of fixed operating costs is offset by the employer's obligation to pay an increased wage rate in accordance with the Teamsters Local Collective Bargaining Agreement and the Massachusetts overtime laws.

It is acknowledged by the Parties that such hourly rates to be paid for Future Contracts will be determined by the marketplace with full compliance with the Prevailing Minimum Wage Law and the Project Labor Agreement, and may be higher or lower than the above rates.

7.    PAYMENTS:  Contractors, subcontractors and brokers agree to pay truckers within fourteen (14) days of their receipt of invoices and acceptable certified payrolls from truckers. Certified payrolls will be considered acceptable to the CA/T Project if they comply with the requirements of the checklist provided in Exhibit A to this Agreement. Payments shall be made by separate checks for wages and for equipment charges, respectively.

Contractors, subcontractors and brokers further agree to pay truckers for all previously invoiced work, with acceptable certified payrolls, prior to this Agreement by three weeks after the date this Agreement is executed.

8.    BENEFITS:  MHD and the Contractors agree to fund a settlement of a grievance by the Teamsters under the Project Labor Agreement regarding back payment of fringe benefits required by the Teamsters Local Union No. 379 Collective Bargaining Agreement (Teamsters Agreement).

2

A.  Effective July 1, 1997 the Contractors agree that each designated approved Subcontractor, will ...loy the truckers on the CA/T Proje ...nd shall ensure payments on their behalf to the Construction Teamsters Health & Welfare Fund and the New England Teamsters & Trucking Industry Pension Fund as required by the Teamsters Agreement.  Any persons determined to be Subcontractors (that is, employers of truck drivers) shall not be eligible for fringe benefits, and contributions will not be accepted by the Funds for hours worked by any employer/driver.

B.  As an alternate method of payment, Project Contractors and Subcontractors who use truck drivers that they consider to be independent contractors shall make fringe benefit fund contributions based on all hours worked by such truck drivers.  Project Contractors and Subcontractors that employ this method of payment shall report such hours worked in the same manner as they report the hours worked of employee truck drivers.  The characterization of a truck driver as an independent contractor by a Project Contractor or Subcontractor shall not be binding on the Teamsters, Local 379, the truck drivers so characterized, or the Trustees of the Construction Teamsters Health & Welfare Fund and of the New England Teamsters & Trucking Industry Pension Fund.

This alternate method may require modification to the Teamsters Local 379 Collective Bargaining Agreement and review and acceptance by the Board of Trustees of both Funds. Details of this method are to be incorporated by the parties involved within 4 weeks of the date of execution of this Agreement.

C.  The MHD and the Contractors also agree to a one time supplemental contribution to the Construction Teamsters Health & Welfare Fund on behalf of those truck drivers identified by the Contractors as currently assigned to support their work on the CA/T Project so as to meet the 600 hour employer contribution necessary for member eligibility for benefits under the Health & Welfare Plan.

Benefit coverage has been targeted for the July 1, 1997 enrollment period.  Actual enrollment shall be as soon as possible following acceptance of contributions by the Trust Fund and submission of appropriate paperwork by the individual truck drivers for coverage.  This process is anticipated to require 3-6 weeks.  Representatives from Teamster Local 379 will provide necessary assistance to the Board of Trustees of the Construction Teamsters Health & Welfare Fund to expedite the enrollment of the truckers under this Agreement.

It is further agreed that, in view of the payment of fringe benefit contributions provided above, Teamsters Local 379, on its behalf and on behalf of all of its members (including those truckers and independent truckers/owner-operators affected by this Agreement), hereby waives and withdraws, with prejudice, any and all grievances, complaints and claims of any kind relating to the improper payment of truck rates or trucker wages and/or benefits, that were raised or could have been raised prior to the execution of this Agreement.  By this action, the Teamster Local releases the Contractors, subcontractors, and brokers from the alleged obligation for unpaid benefit contributions and agrees to request a similar release from the Boards of Trustees of both Funds.

3

9.   WORK STOPPAGES: The ⬤ .es agree that (a) all employers on ⬤ CA/T Project and (b) all truckers, as members of Local 379 and workers on the CA/T Project are bound by the provisions of the Project Labor Agreement, including specifically Article VI, Work Stoppages and Lockouts, which prohibits any strikes, picketing, slowdowns, work stoppages, or other disruptive activity for any reason. Any and all remedies applicable to any violations of the provisions of the Project Labor Agreement shall be pursued to its full extent.

All truckers, working under the provisions of either Paragraph 8A or 8B above, must provide to the Contractor or approved Subcontractor, in order to be eligible to work on the Project, a Letter of Assent to this Agreement (provided as Exhibit B to this Agreement) as a commitment that they will not engage in individual or concerted refusals to perform work on the Project or to prevent access by other truckers to perform work on the Project, or any strikes, picketing, slowdowns, work stoppages, or other disruptive activity for any reason. Any trucker who violates that commitment will be permanently barred from work on the Project. The remedy for violations of this provision include any remedy that is applicable to employees who work under the Project Labor Agreement noted above, as well as the right of the MHD and/or the Contractors to seek, on an ex-parte basis, a restraining order against any such violations.

10.  DISPUTE RESOLUTION: The Committee agrees to form a representative steering committee to meet on an ongoing basis to continue discussions on any issues unresolved by this Agreement, and implement a dispute resolution process to address such issues as a supplement to existing dispute resolution mechanisms. Truck driver labor grievances shall be referred to the grievance process already provided for under the CA/T Project Labor Agreement.

11.  RECOMMENDATION TO ATTORNEY GENERAL'S OFFICE:  The Committee shall recommend that the Attorney General's Office enter into discussions with the Committee regarding:

A. Establishment of some type of amnesty program for the period pre-dating this Agreement;
B. Clarification of enforcement issues that the Attorney General may have on past conflicts;
C. Explanation of future compliance efforts of the parties hereto.

12.  REQUIREMENTS FROM INDIVIDUAL PARTIES:  Each of the Parties agree to take appropriate actions to implement this Agreement as follows:

A. MHD:          Funding; Monitoring of compliance with the Prevailing Minimum Wage Law; Continued requests for Attorney General support of this Agreement; Participation in dispute resolution process.

B. B/PB:         Monitoring of compliance with the Prevailing Minum Wage Law; Uniform standard for documentation; Support to dispute resolution process when requested.

4

C. TRUCKERS:   Perfo(     )ce; Submission of acceptable Certif(    ) Payrolls; participation in dispute resolution process; Agreement not to engage in strikes, stoppages, slowdowns, or other disruptive activities.

D. CONTRACTORS:  Funding; Submission of acceptable Certified Payrolls; Implementation of Grievance settlement; Participation in dispute resolution process.

E. TEAMSTERS:   Representation in accordance with Project Labor Agreement; Implementation of the Grievance settlement, including releases; Participation in dispute resolution process when requested.

F. DEPT OF LABOR:  Continued support and involvement.

13.    EXCLUSIONS FROM THIS AGREEMENT:  This Agreement shall apply to providers of trucking services hauling gravel and fill material on the CA/T from Project excavation sites to and from Subaru; from Project excavation sites to and from landfills and disposal facilities; and from Subaru to and from landfills and disposal facilities. Excluded from this Agreement at this time are settlement of issues related to:

A.    Vendors and Suppliers Hauling to the CA/T Project
B.    Hazardous Material Haulers (defined as licensed transporters hauling material under a Uniform Hazardous Waste Manifest).

The Parties will work cooperatively to clarify to what extent these categories of trucking services should be considered for future inclusion in this Agreement.

**IN WITNESS WHEREOF**, the Parties hereto have caused their duly authorized representatives to execute this Agreement on the ___/___ day of August, 1997.

MASSACHUSETTS HIGHWAY
DEPARTMENT

By _____
    Title: Director of Construction

BECHTEL/PARSONS BRINCKERHOFF

By _____
    Title: Construction Manager

GENERAL CONTRACTORS

By _____
    Construction Industries of MA
    Title:

DEPARTMENT OF LABOR AND
WORKFORCE DEVELOPMENT

By _____
    Title: General Counsel

TEAMSTER LOCAL UNION NO. 379

By _____
    Title: Sec. Treas

TRUCKING INDUSTRY

By _____
    Greater Boston Material Haulers
    Title: Pres.
         V PRES

By: _Robert Job_
Company: _Camp Committee_
Title: _Committee_

By: _Gary Nardone_
Company: _Nardone Const_
Title: _Pres._

By _Norman A Reed_
Company: _Reed Equipment_
Title:

By _Thomas P Morabito_
Company: _TPMORABITO TRCK_
Title: _owner_

By _John P Mahony_
Company: _Teamsters 379_
Title: _Business Agent_

By _Sharon Mills_
Company: _ZAM-TEK_
Title: _President_

By _Daniel J Harmon_
Company: _MASS Gravel, Inc._
Title: _President_

By _Mary A Gutfleda_
Company: _Gutfleda Trucking_
Title: _Owner_

By _Travello Equip Corp._
Company:
Title: _Pres_

By _Kent_
Company: _B/P E_
Title: _Const. Special Projects Mgr._

By _____
Company:
Title:

By: _C Fladden_
Company: _Modern Continental_
Title: _Ex. V. P_

By _____
Company: _Kiewit Construction Co_
Title: _Area Manager_

By _____
Company: _Jay Cushman Inc._
Title: _President_

By _____
Company:
Title:

By _____
Company:
Title:

By _____
Company:
Title:

By _____
Company:
Title:

By _____
Company:
Title:

By _____
Company:
Title:

By _____
Company:
Title:

6

# TRANSPORTER PAYROLL RECORD CHECKLIST

1.  **Name** - Name of owner/operator or driver.

2.  **Address** - Address of owner/operator or driver.

3.  **Occupational Classification** - Type of vehicle being driven as classified in predetermined wage rates for the Contract. Indicate if driver is owner/operator, if applicable (i.e. 10-Wheeler, Tri-Axle, Trailer dump).

4.  **Hours Worked** - Actual number of straight time and overtime hours worked, recorded on a daily basis.

5.  **Wages Paid** - Hourly rate for truck driver labor (predetermined wage rate plus fringes and benefits); does not include truck operating expenses.

6.  **Certification** - Statement attesting to the accuracy of the record in either or both of the following forms:

    •   If hauling from point to point within the Contract job site, a Federal Statement of Compliance form as normally filed with payroll records which certifies them as true and accurate;

        or,

    •   If hauling between the jobsite and other CA/T job sites, or to other offsite destinations, a state certification on the document as follows:

        I, _____ do hereby state that this copy of my record is a true and accurate record, showing the name, address, occupational classification of each such employee on said works, and the hours worked by, and the wages paid to, each such employee, including payments to health and welfare funds, pension funds, supplementary unemployment benefit plans, or the equivalent payment in wages.

        SIGNATURE: _____ (Signed under the penalties of perjury as provided for under Section 27B of Chapter 149 of the Massachusetts General Laws)

        TITLE: _____

# LETTER OF ASSENT

Contract Number: _____

Contract Name: _____


I, _____, (hereinafter Trucker), of _____
     (Truck Driver Name)                                (Company Name)
hereby agree to comply with and be bound to the Project Memorandum of Agreement on Trucking Issues covering trucking services to be performed on the Central Artery/Tunnel Project.

The terms and conditions of the Memorandum of Agreement on Trucking Issues have been entered into by the signatory representatives of the Trucking industry, Teamsters, Contractors, Project, and Department of Labor and Workforce Development on July 23, 1997, and shall apply with respect to the work covered by the above named Contract.


Contractor                                Trucker


_____         _____
   Signature            Date          Signature          Date

# *Memorandum of Understanding as to Teamster Benefits (MOU)*

## *in accordance with the*

# *Central Artery/Tunnel (CA/T) Project Memorandum of Agreement on Trucking Issues (MOA)*

The parties have met and resolved certain questions that have arisen under paragraphs 8A and 8B of the *Central Artery/Tunnel Project Memorandum of Agreement on Trucking Issues (MOA)* dated August 1, 1997. Recognizing the inherent difficulties caused by the fluidity and diversity of owner-operator status, yet desiring to find a fair and equitable resolution without protracted litigation, the parties further agree as follows:

1.     All employee-drivers who the contractor directly employs and who perform work on the *CA/T Project* are covered by the *CA/T Project Labor Agreement (PLA)*. Applicable contributions to the *Construction Teamsters' Health and Welfare Fund* and the *New England Teamsters' and Trucking Industry Pension Fund* (Funds) must be made on their behalf by their employers and such employee-drivers will receive benefits from the Funds' Plans of Benefits.

2.     All owner-operators providing support for *CA/T Project* Work who are employers by virtue of:

   (a)     employing one or more drivers totaling at least 160 hours (in the aggregate) for work on the *CA/T Project* during the 6 month period before certification, **or**

   (b)     employing one or more drivers totaling at least 600 hours (in the aggregate) for work at construction sites other than the *CA/T Project* during the 12 month period before certification

shall, upon appropriate application per paragraph 4 below, be deemed "employers" or

"independent contractors", and contributions to the Funds shall not be required for their work

on the *CA/T Project*.

> *For the purposes of this paragraph:*
>
> \*   an owner who employs only his or her spouse as a driver *shall not* be
>     considered an "employer" or "independent contractor."
>
> \*   If an owner employs a driver in addition to his/her spouse, the spouse-
>     driver *shall* be considered an "employer" or "independent contractor,"
>     provided that the above described 160 hour or 600 hour test is met.

3.      All owner-operators who provide support for *CA/T Project* Work who do not

qualify under paragraph 2 above, shall be deemed, for the purposes of the State Prevailing

Wage Law and the *PLA*, Project employees and contributions must be made on their behalf to

the Funds.

4.      An owner-operator seeking "employer" or "independent contractor" designation

under paragraph 2 above must present his or her contractor a *CA/T Project Employer Affidavit*

(see attached form) and supporting evidence to his or her contractor (*copy to Joe Allegro of*

*Massachusetts Highway Department and C.Matt Wiley of Bechtel/Parsons Brinckerhoff*) no later than

September 29, 1997. The enrollment period to maintain "employer" or "independent

contractor" status or for any change in status from "employee-driver" to "employer" or

"independent contractor", is between December 1 and 15 of each year in order to be excluded

from making benefit contributions to the Funds or receiving Fund benefits for the following six

month period running from January 1 to June 30, and between June 1 and June 15 in order to

be excluded for the following six month period running from July 1 to December 31. For the

purposes of this paragraph "supporting evidence" means (1) copies of remittance forms to the

2

Teamster Funds, (2) copies of certified payroll records or (3) W-2 forms.

Should an owner-operator fail to make an adequate submission in a timely fashion, the owner-operator will be deemed, for the purposes of the State Prevailing Wage Law and the *PLA*, to be a Project employee, and Fund contributions are required on their behalf.

5.      In determining status, MHD, B/PB and the contractor shall have satisfied their obligations under the *Memorandum of Agreement on Trucking Issues (MOA)* dated August 1, 1997 and the *PLA* by reliance on the affidavit and supporting evidence, submitted by an owner-operator certifying his or her status as an employer or independent contractor pursuant to paragraph 2 and therefore not covered by the *PLA* union benefit fund contribution requirements.

At the time a determination is made that a driver is an "employer" or "independent contractor" pursuant to paragraph 4, such determination shall be forwarded to the driver's contractor, the Union and the Teamster Funds. The driver's contractor should immediately stop making benefit Fund contributions on the driver's behalf and begin making equivalent payments directly to the driver-employer.

Notwithstanding this determination, however the Union may challenge the status determination in an arbitration, under and in accordance with the *PLA*, the *MOA* and this *Memorandum of Understanding (MOU)*, against the owner-operator performing work. Similarly, if an owner-operator disputes such determination, he or she may initiate arbitration under the *PLA* for declaratory judgement regarding his or her status. Pending resolution of any such dispute, the driver's contractor shall deposit all Fund contributions into a separate

3

escrow account, and shall report such escrowed contributions in the contractors's fund

remittance forms.

6.    Owner-operators who employ drivers working on the *CA/T Project* must comply

with the *PLA* requirements as to making, or arrange for others to make, benefit fund

contributions for those drivers.

7.    Notwithstanding paragraphs 1-6 above, should a determination be made, at any

time, by the Funds that an owner-operator or driver for whom contributions were received by

the Funds is not eligible for benefits relating to those contributions, any contributions received

by the Funds during the period such owner-operator or driver was determined to be ineligible

for benefits shall be promptly returned by the Funds to the owner-operator or driver.


IN WITNESS WHEREOF, the Parties hereto have caused their duly authorized representatives
to execute this *Memorandum of Understanding as to Teamster Benefits* provided for in the
*Central Artery/Tunnel Project Memorandum of Agreement on Trucking Issues* on this 24th
day of September, 1997.

MASSACHUSETTS HIGHWAY DEPARTMENT
By:    Joseph J. Allegro, Jr., Director of Construction



BECHTEL/PARSONS BRINCKERHOFF
By:    C. Matthew Wiley, Construction Manager



TEAMSTER LOCAL UNION NO. 379
By:    Paul V. Walsh, Secretary/Treasurer



attachment:    *CA/T Project Employer Affidavit*

4

# FEINBERG, CHARNAS & BIRMINGHAM, P.C.

### Attorneys at Law

177 Milk Street   Boston, Massachusetts 02109
617-338-1976

MICHAEL A. FEINBERG
SCOTT E. CHARNAS
THOMAS F. BIRMINGHAM
CATHERINE M. CAMPBELL
ARTHUR G. ZACK
MARK H. LIKOFF
JONATHAN L. FEINBERG

Telecopier 617-338-7070
Toll Free 800-338-6004

September 29, 1997

Mr. Peter M. Zuk
CA/T Project Director
Massachusetts Highway Dept.
One South Station
Boston, MA 02110

Re:   Pension Fund Agreement as to Eligibility for Benefits

Dear Mr. Zuk:

On behalf of the Trustees of the New England Teamsters & Trucking Industry Fund (Fund), I am authorized to advise you that the Fund has reviewed the *Central Artery/Tunnel (CA/T) Project Memorandum of Agreement on Trucking Issues (MOA)* and the *Memorandum of Understanding As To Teamster Benefits (MOU)* and in accordance with the terms of both documents, the Fund agrees to do the following:

1.   Accept benefit contributions on behalf of all owner-operators or drivers deemed to be "employees" as defined in the *M.O.U.* (attached). The Fund will not accept any benefit contributions on behalf of "employers";

2.   Provide pension benefits to employee-drivers for whom benefit contributions are made; provided, however, should a determination be made, at any time, by the Fund, that an owner-operator or driver for whom the Fund has accepted benefit contributions is not eligible for benefits relating to those contributions, the Fund shall immediately return those contributions, received by the Fund during the period such owner-operator or driver was determined to be ineligible, to said owner-operator or driver; or take such action as otherwise required by law;

3.   Hereby waives, with prejudice, any and all potential demands, complaints and claims of any kind, relating to the improper payment of benefit contributions for hours worked under the CA/T Project Labor Agreement prior to July 1, 1997, provided, however, if the Fund is determined to be liable for benefits on account of CA/T project hours worked prior to July 1, 1997,

# CONSTRUCTION TEAMSTERS HEALTH & WELFARE FUND

222 FORBES ROAD
SUITE 400
BRAINTREE, MASSACHUSETTS 02184

TEL 448-0222

UNION TRUSTEES

Paul J. Walsh, Chairman
Teamsters Local #379

Paul G. S.
Teamsters Local #379

John P. Mahoney
Teamsters Local #379

EMPLOYER TRUSTEES

Roger Mroszczak, Secretary
Barden Trimount

John D. O'Reily
Southborough, MA

Peter Marin
Barletta Engineering Corp

October 1, 1999

Dear Participant:

This office has received notice from Attorney Edward Holden that you claim independent contractor status on the Central Artery/ Tunnel Project. Independent contractor status will affect your eligibility for health benefits from the Construction Teamsters Health and Welfare Fund. It will not excuse the obligation to make contributions on account of all hours you work on the project. For this reason the Trustees have asked that I write this letter explaining the effect of a claim of independent contractor status on your eligibility for health benefits.

The Health and Welfare Fund is governed by a law that authorizes contractor payments into trust funds to provide various benefits to employees and their families. Under the Project Labor Agreement and the CA/T trucking agreements contractors must make contributions to the Health and Welfare Fund and for all hours worked whether worked by employee drivers or independent contractor drivers. The Health and Welfare Fund has treated drivers as employees who are entitled to benefits unless and until the Trustees receive notice that the contractor or the drivers themselves consider themselves not to be employees.

The effect of Mr. Holden's statement that you claim independent contractor status is to put the Fund on notice that you claim not to be eligible for benefits even though contributions will still be required for all hours you work. If this is not accurate representation of your status, you should advise this office promptly. The fund will not provide benefits to drivers who claim independent contractor status absent an order from the court to do so.

Sincerely,

Christopher J. Walsh
Fund Administrator
Construction Teamsters - Health & Welfare Fund

CJW

PLAINTIFF'S EXHIBIT
D

SUITE 400
BRAINTREE, MASSACHUSETTS 20104

1 781-848-0366

UNION TRUSTEES

Paul V. Walsh, Chairman
    Teamsters Local #379

Neil Otis
    Teamsters Local #379

John P. Mahoney
    Teamsters Local #379

EMPLOYER TRUSTEES

Robert Progson, Sec.-Treas
    of BRAM Transum

John J. O'Neary, III
    Southborough, MA

Peter Menm
    Barletta Engineering Corp.

Friday, October 22, 1999

Dear Participant:

The trustees of the Construction Teamsters Health and Welfare Fund met this week and reviewed your status as a participant in the Fund. In particular they looked at Attorney Holden's claim that you are an independent contractor and my letter to you dated October 1, 1999. The trustees noted that some individuals had responded to my letter by saying that they were not independent contractors while at least one driver confirmed his status as an independent contractor. The vast majority of drivers who received the October 1, 1999 letter have not responded at all.

The trustees reiterated their intention to comply with the law. No benefits will be provided for independent contractors even though contributions will be required for independent contractors for those hours they work on the CAT project. Benefits will continue to be provided to employees.

The trustees thought you were an employee at all times prior to receipt of Attorney Holden's letter. In his letter, he claims that you are an independent contractor. Please notify the Fund office if you disagree with his characterization. Notices concerning your status must be received by the trustees on or before December 15, 1999.

Current benefits will remain in place up to and through December 31, 1999 or until we receive confirmation that you are an independent contractor, whichever is earlier. Current benefits will remain in place indefinitely for all eligible employees. Current benefits will cease on December 31, 1999 if we do not hear from you by then.

Please write to the Fund office about your status and please do so as soon as possible.

Sincerely,

*Christopher J Walsh*

Fund Administrator
Construction Teamsters - Health & Welfare Fund

CJW

PLAINTIFF'S
EXHIBIT

E

ALLSTATE LEGAL®